IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

GWENDOLYN CAMPBELL,

     Plaintiff,

v.

WOOD ENVIRONMENT &
INFRASTRUCTURE SOLUTIONS,
INC.,

     Defendant.

CIVIL ACTION FILE NO.
1:20-cv-002365-JPB-LTW

## MAGISTRATE JUDGE'S FINAL REPORT AND RECOMMENDATION

This case is before the Court on a Motion for Summary Judgment filed by Defendant Wood Environment & Infrastructure Solutions, Inc. ("Wood").  [Doc. 29]. For the reasons provided below, the undersigned **RECOMMENDS** that the Motion for Summary Judgment be **GRANTED**.

## FACTUAL BACKGROUND

In May 2014, Plaintiff[1] began working as a project coordinator for Defendant's predecessor on its United States Postal Service ("USPS") program, reporting to Steven Youngs.  [Doc. 33-1 ¶¶1–2].  While assigned to Defendant's Kennesaw office, Plaintiff

---

[1] Plaintiff asserts in her Complaint that she is African American.  [Doc. 1].

was "not allowed to [work out of] the corporate office" that was closer to her home unless she got approval from Mr. Youngs. [Doc. 29-4 at 62:4–15]. A coworker in the USPS program who lived in Seattle, Michele Powelson, was allowed to work from home. [Id. 62:15–18]. Neither the corporate office where Plaintiff wanted to work nor the Seattle office near Ms. Powelson supported the USPS program, so employees working on the USPS programs could not work from those offices on a full-time basis. [Id. at 73:13–74:20]. At some point before Plaintiff left the Kennesaw office, Ms. Powelson was offered the opportunity to work as a project manager. [Id. at 62:21–63:1]. Plaintiff never applied for the position because she "was not even aware of it." [Id. at 63:2–6]. Around May 2018, Plaintiff told a Human Resources ("HR") representative that she believed she was being subjected to racial discrimination by Mr. Youngs. [Doc. 36-1 ¶4]. Plaintiff then a had a variety of problems with Mr. Youngs at indeterminate times thereafter.

Mr. Youngs asked another employee to train Ms. Powelson because, in Plaintiff's words, Plaintiff was "the only one that ha[d] a problem with [Ms. Powelson]." [Doc. 29-4 at 87:8–89:13]. Mr. Youngs told Ms. Powelson "to go report [Plaintiff] to HR" after Ms. Powelson complained that Plaintiff's "feedback" was bullying. See [id. at 65:21–24]; see also [Id. at 117:10–118:6]. Later, Plaintiff spoke with "a construction manager in the Charlotte office" referred to only as

"Henry."  [Id. at 63:22–3].  According to Plaintiff, Henry told her that he helped a young woman who was ill and received "a call from [Mr. Youngs] stating that upper management in [Charlotte] stated Henry was having a relationship with this girl and he wants Henry to stop immediately."  [Id. at 64:3–15].  Apparently, the allegations against Henry were false and, as will be discussed more below, Plaintiff maintains Mr. Youngs "did not tell [the unspecified 'upper management'] to go to HR."  [Id. at 64:16–23].

Mr. Youngs also asked an employee with less knowledge than Plaintiff to conduct a training because, Plaintiff contends, of a "lack of respect."  [Id. at 90:7–95:7].  In another incident, Mr. Youngs "got so angry" when Plaintiff informed him that a process had not changed even though he believed it had.  [Id. at 108:6–109:25].  Then during a company dinner, an employee said he was retiring to go start a church.  [Id. at 110:10–14].[2]  After being asked to sing by other people at the meeting, Plaintiff sang gospel songs and told a story about a little boy who "thought there was no God."  [Id.

---

[2] The events surrounding this dinner are discussed in Plaintiff's response to the Motion for Summary Judgment but are not in Plaintiff's Statement of Additional Facts.  See [Doc. 33 at 9–11]; see also [Doc. 33-2].  The Local Rules are clear that the Court "will not consider any fact . . . set out only in the brief and not in the [statement of additional facts]."  N.D. Ga. Loc. R.  56.1(B)(1)(d);  see also id. 56.1(B)(2)(b) (providing that the statement of additional facts "must meet the requirements set out in LR 56.1 (B)(1)").  Despite this mistake, the undersigned discusses these facts.

at 110:14–111:6].  Mr. Youngs "went to HR to report that [Plaintiff] was at the meeting singing and talking about God," and an HR representative told Plaintiff she "should not have spoken about God" because the "company's money paid for the meeting."  [Id. at 111:7–22].   Later, a different HR representative told Plaintiff "there was nothing wrong" with her talking about God at the dinner and "this should never have been brought to HR" because there were no clients present during the meeting.  [Id. at 112:6–13].   Last, during a meeting when Mr. Youngs was talking with another employee, Plaintiff interjected "to explain to them how the vendor setup program worked."  [Id. at 135:2–136:3].  Mr. Youngs said he did not "want to hear anything, anything at all from [Plaintiff]" and continued his conversation with the other employee.  [Id. at 136:4–10].

In July 2019, at Plaintiff's request, Plaintiff was transferred to an office in Columbus, Georgia where she no longer reported to Mr. Youngs.  See [Doc. 33-1 ¶5]; [Doc. 36-1 ¶8].   On December 9, 2019, Plaintiff was placed on a performance improvement plan ("PIP") due to "behavioral and conduct issues."  [Doc. 33-1 ¶¶6–7].[3]  Specifically, in the less than six months Plaintiff had been at the Columbus site

---

[3] Plaintiff purports to dispute certain facts by citing "generally" to [Doc. 29-4]. [Doc. 33-1 ¶¶7–8].  To properly dispute a fact, a party must provide "specific citations to evidence (including page or paragraph number)."   N.D. Ga. Loc. R. 56.1(B)(2)(a)(2)(i).  Plaintiff cannot cite "generally" to a document that is over 450 pages long and expect the Court to guess what portion supports her position.  See

she allegedly bullied another manager, "made disparaging comments," "became belligerent with a team member after they inadvertently overlooked her in the room during a meeting," "made [Defendant's] client uncomfortable with her approach and insistence," and "left a mandatory meeting held to discuss a rule violation by an employee of one of the providers she oversaw." [Doc. 33-1 ¶8].

Plaintiff, for her part, contends that the factual basis for the PIP was "lies." [Doc. 29-4 at 198:16–199:8].[4]  Plaintiff asserts that the failure to call on her during a meeting was not "a coincidence" and was instead retaliation because "they were evil people." [Id. at 200:22–205:5].  Plaintiff explained that she "was not bullying" another manager because the manager "was the slut of the team" and "her behavior was deplorable."  [Id. at 205:6–206:3].  While Plaintiff maintained it was "not true" that she made a client uncomfortable with her conduct, Plaintiff admitted she had no

---

[Doc. 29-4].  The purpose of Local Rule 56.1 is to get parties to "organize the evidence rather than leaving the burden upon the district judge."  Reese v. Herbert, 527 F.3d 1253, 1268 (11th Cir. 2008) (quoting Alsina–Ortiz v. Laboy, 400 F.3d 77, 80 (1st Cir. 2005)).  The Court will not "dig through volumes of documents and transcripts" to try to find facts that might support Plaintiff's position.  Chavez v. Sec'y Fla. Dep't of Corr., 647 F.3d 1057, 1061 (11th Cir. 2011).

[4] Although Plaintiff initially contended everything in the PIP were "lies," she later admitted that she made a "joke" that "Latin people . . . when they think they're in trouble, they pretend to forget to know English."  [Doc. 29-4 at 214:15–216:21].  Because Plaintiff was "making a joke," she did not understand how her statement "could be taken as a disparaging comment towards Latinos."  [Id. 216:22–217:5].

evidence to support her position.  [Id. at 221:17–223:7].  Last, Plaintiff conceded that she left in the middle of a mandatory meeting, but she asserted that she did so because of "an emergency."  [Id. 223:8–225:12].

The PIP provided that: (1) Plaintiff not make derogatory statements about any person associated with the project; (2) Plaintiff was required to follow chain of command regarding client interaction; (3) Plaintiff was required to "adjust her conduct/behavior so as to minimize client complaints"; (4) Plaintiff was required to review Defendant's Code of Conduct Policy and Harassment Free Workplace Procedure and sign and return the relevant acknowledgement page; and (5) Plaintiff was required to "read a specified website that included information about conversational leadership."  [Doc. 33-1 ¶9]; [Doc. 36-1 ¶12].  Prior to Plaintiff being placed on the PIP, one of Defendant's clients, Bruce May, asked Plaintiff about duplicative invoice requests for some repaving work.  See [Doc. 29-4 at 245:2–246:13]. On January 7, 2020, after Plaintiff had been placed on the PIP, Plaintiff made an ethics hotline complaint about the allegedly fraudulent invoice request.  [Doc. 33-1 ¶23]. After making her complaint, Plaintiff went to Mr. May and informed him that his "name was included" in the complaint.  [Doc. 29-4 at 249:21–250:13].  Mr. May, in turn, contacted Jeff Engels—Plaintiff's supervisor at the time—and "expressed his

dissatisfaction with being involved involuntarily in an internal Wood matter." [Doc. 33-1 ¶12].

On February 5, 2020, Plaintiff was terminated.  [Doc. 29-4 at 243:8–244:3]. During her deposition, Plaintiff admitted that she "failed to comply with the requirements in her PIP that she review Wood's Code of Conduct policy, U.S. Harassment Free Workplace Procedure, and website and sign and return an acknowledgement that she had reviewed those documents." [Doc. 33-1 ¶17].  As will be discussed more below, Defendant contends Plaintiff also violated the PIP by contacting Mr. May in January 2020, while Plaintiff argues she "never initiated contact with Bruce May."  See [Doc. 33-1 ¶¶13–16]; see also [Doc. 36-1 ¶¶17–18].  At least one non-Black employee on the same project was terminated for failing to fulfill the requirements of his PIP.  [Doc. 33-1 ¶22].[5]

## LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

---

[5] As a final matter, Defendant's Statement of Material Facts contains several purported facts supported only by a "general[ ]" citation to Plaintiff's Notice of Right to Sue.  See [Doc. 33-1 ¶¶21, 25–27].  The evidence cited does not support Defendant's purported facts, and as discussed above the Court will not dig through the record to try to find evidence to support Defendant's position.  See Chavez, 647 F.3d at 1061.

matter of law." Fed. R. Civ. P. 56(a).  The movant can discharge this burden by merely

"'showing'—that is, pointing out to the district court—that there is an absence of

evidence to support the nonmoving party's case." <u>Celotex Corp. v. Catrett</u>, 477 U.S.

317, 325 (1986). After the movant has carried her burden, the non-moving party is

required to "go beyond the pleadings" and present competent evidence designating

specific facts showing a genuine disputed issue for trial.  <u>Id.</u> at 324.

While the court is to view all evidence and factual inferences in a light most

favorable to the non-moving party, "the mere existence of *some* alleged factual dispute

between the parties will not defeat an otherwise properly supported motion for

summary judgment; the requirement is that there be no *genuine* issue of *material* fact."

<u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986) (emphasis in original).

A fact is material when it is identified as such by the controlling substantive law.  <u>Id.</u>

at 248.  An issue is not genuine if it is unsupported by evidence, or if it is created by

evidence that is "merely colorable" or is "not significantly probative."  <u>Id.</u> at 249-50.

To the extent one party's version of events "is blatantly contradicted by the record,"

the "court should not adopt that version of the facts for purposes of ruling on a motion

for summary judgment."  <u>Scott v. Harris</u>, 550 U.S. 372, 379–81 (2007).

## **LEGAL ANALYSIS**

Plaintiff brings claims for race discrimination and retaliation under Title VII of

the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et. seq.* ("Title VII") and 42 U.S.C. § 1981.  [Doc. 1 ¶¶32–53].  Because Title VII and § 1981 "have the same requirements of proof and use the same analytical framework," the Court discusses Plaintiff's claims under each statute together.  Chapter 7 Tr. v. Gate Gourmet, Inc., 683 F.3d 1249, 1256–57 (11th Cir. 2012) (quoting Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1330 (11th Cir.1998)).

## I.   Discrimination

Because Plaintiff does not offer direct evidence of discrimination, the Court applies the McDonnell Douglas[6] burden-shifting framework.  Under that framework, Plaintiff first has the burden of establishing a prima facie case of discrimination.  See McDonnell Douglas, 411 U.S. at 802; Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981).  If the plaintiff meets her burden, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action.  McDonnell Douglas, 411 U.S. at 802; Burdine, 450 U.S. at 254; Chapman v. AI Transp., 229 F.3d 1012, 1024 (11th Cir. 2000) (*en banc*).  Plaintiff is then given an opportunity to show that Defendant's proffered nondiscriminatory reason was merely a pretext for discriminatory intent.  Burdine, 450 U.S. at 253; Chapman,

---

[6] McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)

229 F.3d at 1024.

### A.   <u>Prima Facie Case</u>

A prima facie case of discrimination generally requires the plaintiff to show: "(1) she is a member of a protected class; (2) she was subjected to adverse employment action; (3) her employer treated similarly situated employees more favorably; and (4) she was qualified to do the job." <u>McCann v. Tillman</u>, 526 F.3d 1370, 1373 (11th Cir. 2008) (quoting <u>EEOC v. Joe's Stone Crab, Inc.</u>, 220 F.3d 1263, 1286 (11th Cir. 2000)). To be sure, a "plaintiff's failure to produce a comparator does not necessarily doom the plaintiff's case." <u>Smith v. Lockheed-Martin Corp.</u>, 644 F.3d 1321, 1328 (11th Cir. 2011). But when a plaintiff lacks "a valid comparator," she needs some "other evidence" of discrimination such as "an unwritten" discriminatory policy, "evasive answers" regarding a discriminatory practice, etc. <u>See</u> <u>Rioux v. City of Atlanta, Ga.</u>, 520 F.3d 1269, 1281–82 (11th Cir. 2008).

Here, while Plaintiff suggests she can rely on "the mosaic standard," the *only* evidence she points to is that she was allegedly treated differently from other employees. [Doc. 33 at 12–13] (arguing she "was not permitted to work remotely when Ms. Powelson, a Caucasian co-worker, was allowed to do so"; that "Ms. Powelson was given a position for which she was not qualified, while Plaintiff was qualified, yet not selected"; and that HR "was not asked to investigate" a Caucasian co-worker while

"Plaintiff was reported to HR").  Different employees being treated differently is not indicative of discrimination unless the employees were otherwise "similarly situated." To be "similarly situated," an individual outside the plaintiff's protected class must be similar in "all material respects."  Lewis v. City of Union City, Georgia, 918 F.3d 1213, 1227–28 (11th Cir. 2019).  Plaintiff never argues the other employees were "similarly situated," and the records shows they were not.  See [Doc. 33 at 12–13].

There were "two local offices" that supported the USPS program Plaintiff and Ms. Powelson worked on: Kennesaw and Charlotte.  See [Doc. 29-4 at 73:13–23]. While Defendant's corporate office was closer to Plaintiff's home, Plaintiff lived an hour from the Kennesaw office.  [Id. at 62:10–15].  Ms. Powelson lived near Seattle. See [id. at 62:15–17].  Thus, the two employees' circumstances were markedly different; Plaintiff lived an hour from an office that supported the USPS program, Ms. Powelson did not.  The policy Defendant applied to each employee was the same— neither employee worked full-time at an office that did not support the USPS program. [Id. at 73:13–74:20].  Plaintiff and Ms. Powelson were treated differently because of their different geographical circumstances, and Plaintiff offers no evidence to the contrary.  See [Doc. 33 at 2, 13].

Nor were Plaintiff and Ms. Powelson "similarly situated" when it came to the project management position Ms. Powelson received.  Ms. Powelson applied for the

11

position; Plaintiff did not.  [Id. at 62:21–63:6].  "The fact that [Plaintiff] did not get a

job for which she did not apply is not evidence of discrimination."  Howell v. Compass

Grp., 448 F. App'x 30, 34 (11th Cir. 2011).[7]

Plaintiff's argument regarding "Henry" is also tenuous.  First, Plaintiff's account

of the Henry saga is either double or triple hearsay—it is Plaintiff's retelling of what

Henry said Mr. Youngs told him about what unspecified "upper management" in

Charlotte reported.  [Doc. 29-4 at 63:22–64:18].  Second, Henry held a different

position and worked in a different location during the relevant timeframe.  [Id. at

63:22–23].   Third, the alleged misconduct Henry engaged in was nothing like

Plaintiff's alleged misconduct.  Henry was accused of "having a relationship" with a

co-worker.  [Id. at 64:12–18].  Ms. Powelson accused Plaintiff of "bullying her."  [Id.

at 64:23–24].  Fourth, the allegations against Henry were apparently false.  [Id. at

64:12–18].  While Plaintiff's counsel asserts that Plaintiff was "wrongfully" reported

for bullying, the evidence cited does not support that assertion.  See [Doc. 33 at 3];

---

[7] Although Plaintiff does not make the argument (see [Doc. 33]), the undersigned notes that Plaintiff testified Mr. Youngs gave Ms. Powelson the position before "he made that position public."  [Doc. 29-4 at 63:2–6].  If the opening was not publicly posted and Plaintiff did not have an opportunity to apply, her failure to apply would not be determinative.  See Howell, 448 F. App'x at 34.  Assuming arguendo that Plaintiff can show a prima facie case of discrimination, her claims still fail because she cannot show the reasons for her termination were pretextual, as discussed below.

[Doc. 29-4 at 63:22–64:25].  Fifth, Plaintiff presents no competent evidence Henry "was not reported to HR," as she claims.  See [Doc. 33 at 3].  Neither Plaintiff nor Henry were privy to the conversation between Mr. Youngs and "the Charlotte office," so Plaintiff's speculation that Mr. Youngs "didn't tell [some unspecified person] to go to HR" cannot be considered as evidence.  [Doc. 29-4 at 65:13–16]; see also Martin v. Fin. Asset Mgmt. Sys., Inc., 959 F.3d 1048, 1057 (11th Cir. 2020) (refusing "to credit [the plaintiff's] speculation as evidence" where the plaintiff "was not part of [the] conversation" at issue).  Sixth, Plaintiff's entire argument is based on a false premise. Plaintiff contends Mr. Youngs "could have called [her] in his office" to discuss Ms. Powelson's complaints.  [Id. at 65:18–24].  Mr. Youngs did exactly that—"He called [Plaintiff] into his office to tell [Plaintiff] what was going on with what [Ms. Powelson] said" after Ms. Powelson "complained about bullying."  [Id. at 117:10–118:6].

The above evidence does not establish a prima facie case of discrimination. Setting aside the fact that the other employees were not "similarly situated" to Plaintiff, the evidence is not a "convincing mosaic."  Ms. Powelson, who lived approximately two thousand miles from the nearest office supporting the USPS program, was allowed to work from home, while Plaintiff, who lived an hour from an office that supported the USPS program, was not.  Plaintiff did not receive a project management position that she did not apply for.  And both Plaintiff and Henry were spoken to personally by

Mr. Youngs about different kinds of misconduct each allegedly engaged in. Crucially, each of these three incidents involved decisions by Mr. Youngs who was not involved with the decision to terminate Plaintiff. Even if Plaintiff could establish a prima facie case of discrimination, Plaintiff claims fail because she cannot show Mr. Engels' reasons for terminating her were pretextual.

**B.**    **Legitimate, Non-Discriminatory Reason**

If Plaintiff had established a prima facie case of discrimination, the burden would shift to Defendant to articulate a legitimate, nondiscriminatory reason for Plaintiff's termination.[8] McDonnell Douglas, 411 U.S. at 802. This burden is one of production, not persuasion, and is "exceedingly light." Turnes v. AmSouth Bank, N.A., 36 F.3d 1057, 1061 (11th Cir. 1994). Plaintiff concedes Defendant met this burden by asserting the termination occurred because "Plaintiff did not conform with the stipulations of her PIP," and thus the burden shifts back to Plaintiff to show that reason is pretext for discrimination. [Doc. 33 at 14]; see also Burdine, 450 U.S. at 253.

**C.**    **Pretext**

To rebut Defendant's reason, Plaintiff must demonstrate "such weaknesses,

---

[8] The only adverse employment action Plaintiff points to with respect to her discrimination claims is the termination. [Doc. 33 at 12]. Plaintiff's assertion that she suffered a "retaliatory hostile work environment" is part of her retaliation claim. See [id. at 8–10].

implausibilities, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." Jackson v. State of Ala. State Tenure Comm'n, 405 F.3d 1276, 1289 (11th Cir. 2005) (quoting Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir. 1997)). She "cannot succeed by simply quarreling with the wisdom of [the employer's] reason." Chapman, 229 F.3d at 1030. Where an employer offers more than one reason for an adverse employment action, the plaintiff must rebut "each of the proffered reasons of the employer." Crawford v. City of Fairburn, Ga., 482 F.3d 1305, 1309 (11th Cir. 2007).

Defendant says Plaintiff was fired for not complying with her PIP which provided that: (1) Plaintiff not make derogatory statements about any person associated with the project; (2) Plaintiff was required to follow chain of command regarding client interaction; (3) Plaintiff was required to "adjust her conduct/behavior so as to minimize client complaints"; (4) Plaintiff was required to review Defendant's Code of Conduct Policy and Harassment Free Workplace Procedure and sign and return the relevant acknowledgement page; and (5) Plaintiff was required to "read a specified website that included information about conversational leadership." [Doc. 33-1 ¶9]; [Doc. 36-1 ¶12]. Plaintiff freely admits she did not comply with the last two requirements. [Doc. 33-1 ¶17]. Instead, Plaintiff asserts she "did not solicit Mr. May," that she "did

not make any 'derogatory' remarks about management" to Mr. May, and that her "only recourse" was to file the ethics complaint. [Doc. 33 at 15–16]. Plaintiff's assertions are neither entirely accurate nor persuasive.

Plaintiff had a conversation with Mr. May about the duplicative invoicing around the end of October or early November. [Doc. 29-4 at 247:22–248:4]. Plaintiff was not terminated for this conversation with Mr. May. Instead, Plaintiff was terminated for a conversation that took place *months later* when Plaintiff called Mr. May to tell him that she included his name in her internal ethics complaint. [Id. at 250:6–13]. Plaintiff did not initiate the October/November 2019 conversation with Mr. May, but she did initiate the January 2020 conversation that led to the termination. Moreover, whether Plaintiff "initiated" the conversation or not is irrelevant. The PIP provides that Plaintiff is not to make "derogatory statements" to the client. [Doc. 29-5 at 3–4]. The PIP does not say Plaintiff can make derogatory statements during conversations she did not initiate. See [id.].

Additionally, Plaintiff's assertion that Mr. May was the one who "made 'derogatory' remarks about the management team to Plaintiff" is not exactly accurate either. See [Doc. 33 at 15]. Mr. May told Plaintiff he was "not going to respond to [her] solicitation" because "the vendor said he already submitted a price to the landscaper" for some repaving work. [Doc. 245:20–246:2]. While Mr. May asked

what was "going on" and said, "It doesn't look good," it was Plaintiff who came to the conclusion that Mr. Engels was "making money off this." [Id. at 245:12–246:15]; see also [id. at 276:15–277:24].  Because Plaintiff's supervisor, Mr. Engels, was "possibly" falsifying invoices, Plaintiff's "only recourse left was to file an ethics complaint." [Doc. 33 at 15].  But again, Plaintiff was not terminated for filing the ethics complaint, as she tries to suggest.  Instead, Plaintiff was terminated for *then* contacting the client, Mr. May, about her complaint.

Regardless of whether Plaintiff "initiated" the January 2020 conversation with Mr. May and regardless of whether she made any "derogatory statements" during that conversation, the undisputed fact is that Mr. May "expressed his dissatisfaction with being involved involuntarily in an internal Wood matter."  [Doc. 33-1 ¶12].  Plaintiff's PIP required Plaintiff to adjust her "conduct/behavior to eliminate calls from the client" about Plaintiff's behavior.  [Doc. 29-5 at 3].  Regardless of whether Plaintiff felt her conduct was appropriate, Mr. May—the client—did not.  [Doc. 33-1 ¶12].  As such, Plaintiff violated the PIP and was terminated.  [Doc. 29-7 ¶¶5–9].

Plaintiff readily admits to violating two of the five requirements of her PIP, and her argument that she did not violate other requirements is unpersuasive for the reasons above.  See [Doc. 33-1 ¶¶12, 17].  Just like Plaintiff, an employee outside Plaintiff's protected class was terminated for failing to fulfill the requirements of his PIP.  [Id.

¶22].  In short, Plaintiff's arguments are not the kind of "weaknesses, implausibilities, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence."  Jackson, 405 F.3d at 1289.

Even if Plaintiff had shown Mr. Engels' reasons for terminating her were false, that would not mean Plaintiff has shown they were "pretext for discrimination."  To succeed on her race discrimination claims, Plaintiff must show "*both* that the reason was false, *and* that discrimination was the real reason."  St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993) (emphasis in original).  All of Plaintiff's evidence of alleged racial discrimination pertains to Mr. Youngs.  [Doc. 33 at 13].  Yet, Mr. Youngs did not terminate Plaintiff, Mr. Engels did.  [Doc. 29-7 ¶9].  Even if Mr. Engels fired Plaintiff for reporting him for "possibly" falsifying invoices, that would not support a claim for *race discrimination*.  See [Doc. 33 at 15–16].  Plaintiff must show Mr. Engels decided to terminate her because of her race, which she does not do.  For all the foregoing reasons, the undersigned **RECOMMENDS** that Defendant's Motion for Summary Judgment be **GRANTED** as to Plaintiff's discrimination claims.

## II.    Retaliation

### A.    Prima Facie Case

The McDonnell Douglas framework also applies to Plaintiff's retaliation

18

claims.  See Gupta v. Florida Bd. of Regents, 212 F.3d 571, 587 (11th Cir. 2000) *overruled on other grounds as recognized by* Crawford v. Carroll, 529 F.3d 961, 973–74 (11th Cir. 2008).  To state a prima facie case of retaliation, Plaintiff must show: (1) she engaged in statutorily protected expression, (2) the employer took a materially adverse action against her, and (3) some causal relationship existed between the two events.  Crawford v. Carroll, 529 F.3d 961, 970 (11th Cir. 2008) (Title VII case); see also Goldsmith v. Bagby Elevator Co., Inc., 513 F.3d 1261, 1277 (11th Cir. 2008) (holding that the elements of retaliation claims under Title VII and § 1981 are the same).

Plaintiff undoubtedly engaged in protected activity when she told an HR representative that she believed she was being subjected to racial discrimination around May 2018.  [Doc. 36-1 ¶4].  Plaintiff asserts "she continued to make complaints that she was facing racial discrimination" after July 2019, but the evidence she cites does not support that assertion.  See [Doc. 33 at 3].  During her deposition, Plaintiff was asked if she had any evidence to support an allegation "in [her] complaint" where she asserted that she "made supplemental reports regarding continued discriminatory treatment."  [Doc. 29-4 at 263:20–264:5].  An allegation in a complaint is not evidence.  See N.D. Ga. Loc. R. 56.1(B)(1)(b).  In response, Plaintiff said Mr. Engels "refused to listen to anything [she] said," but Plaintiff never indicated she made subsequent

complaints regarding alleged discrimination.  See [Doc. 29-4 at 264:1–9].  Instead, Plaintiff explained Mr. Engels "would not allow [her] to speak" in meetings about other topics, such as a security employee violating a rule and a meeting about a contract.  [Id. at 265:18–266:18].  Plaintiff said Mr. Engels' actions were "discriminatory," but could not say they were "retaliation for [her] complaints about Steve Youngs previously." [Id. at 265:6–15].

As for the second element, a Title VII retaliation claim does not require a plaintiff "to show either an ultimate employment decision or substantial employment action."  Crawford, 529 F.3d at 973–74.  Rather, the plaintiff need only show a "materially adverse" action, which "means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  Id. at 974 (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006)).  However, the Supreme Court has made clear that the "*material* adversity" element does not include "trivial harms" such as "petty slights, minor annoyances, and simple lack of good manners."  Burlington, 548 U.S. at 68 (emphasis in original); see also id. at 69–70 (stating that the goal of the standard is to "screen out trivial conduct while effectively capturing those acts that are likely to dissuade employees from complaining or assisting in complaints about discrimination.").  The standard is based on the "reactions of a *reasonable* employee," not "a plaintiff's unusual subjective feelings."  Id. at 68–69

20

(emphasis in original).  The significance of any alleged act of retaliation depends "upon the particular circumstances."  Id. at 69.

Plaintiff alleges she suffered a materially adverse action when she was terminated and that she suffered a "retaliatory hostile work environment."  See [Doc. 33 at 8].  Specifically, Plaintiff asserts she was "castigated and orally disciplined for singing a gospel song," that Mr. Youngs "embarrassed Plaintiff by summarily dismissing and ignoring her during a meeting," and that she was "placed on a PIP" and terminated for attempting "to address an unsolicited client complaint."  [Doc. 33 at 9–10].  The PIP and the allegedly retaliatory termination are sufficiently adverse and are discussed separately below.  But the other conduct does not rise to the level of material adversity under Burlington and its progeny.

An HR representative told Plaintiff she "should not have spoken about God" during a dinner because the company's "money paid for the meeting."  [Doc. 29-4 at 110:1–112:5].  Later, a different HR representative said there was "nothing wrong with [Plaintiff] singing and talking about God" because there was no client at the meeting.  [Id. at 112:6–13].  Although Plaintiff may have felt she was "castigated," the material adversity standard is not based on subjective feelings.  Burlington, 548 U.S. at 68–69.  No reasonable employee would be dissuaded from making or supporting a charge of discrimination based on a disagreement between two HR representatives over whether

Plaintiff could talk about God during a company dinner.

Likewise, the fact that Plaintiff felt "embarrassed" when Mr. Youngs dismissed and ignored her during a meeting does not mean she suffered a materially adverse action. Mr. Youngs was talking with a different employee when Plaintiff interjected "to explain to them how the vendor setup program worked." [Doc. 29-4 at 135:2–136:3]. Mr. Youngs said he did not "want to hear anything, anything at all from [Plaintiff]" and continued his conversation with the other employee. [Id. at 136:4–10]. Mr. Youngs response was certainly crass, but a "simple lack of good manners" is not a materially adverse action. Burlington, 548 U.S. at 68.

The cases finding materially adverse actions are quite different from the "retaliatory hostile work environment" Plaintiff complains of. It is "obvious that a reasonable worker might be dissuaded from engaging in protected activity if she knew that her fiance [sic] would be fired." Thompson v. N. Am. Stainless, LP, 562 U.S. 170, 174 (2011). And statements that "threatened both termination and possible physical harm" easily satisfy the standard. Monaghan v. Worldpay US, Inc., 955 F.3d 855, 863 (11th Cir. 2020). But Plaintiff points to no authority, and the Court has found none, finding that the kind of conduct at issue here satisfies the "well might have dissuaded" standard. See [Doc. 33 at 10]. Even when viewed collectively, the conduct Plaintiff complains of are the kind of "trivial harms" the Burlington Court warned against. 548

U.S. at 68.  Being told by an HR representative not to talk about God during company meetings, being dismissed and ignored after interjecting in another person's conversation, and the other alleged mistreatment Plaintiff complains of are "petty slights, minor annoyances, and simple lack of good manners," not materially adverse actions.  See id.[9]

However, as noted above, Plaintiff's PIP and subsequent termination are undoubtedly the kinds of actions that might well dissuade a reasonable employee from making a charge of discrimination.  Still, to make out a prima facie case, Plaintiff must establish a "causal relationship" between her protected activity and the materially adverse action(s).  Crawford, 529 F.3d at 970.  Mr. Youngs was undoubtedly aware of Plaintiff's complaint of alleged racial discrimination, but he did not make the decision to place Plaintiff on a PIP or to terminate her.  Additionally, Plaintiff's complaint about Mr. Youngs was made around May 2018, which was over a year-and-a-half before Plaintiff was placed on a PIP and terminated.  [Doc. 33-1 ¶6]; [Doc. 36-1 ¶4].  The

_____

[9] Moreover, it is not enough for Plaintiff to simply point to allegedly "hostile" behavior.  To establish a *retaliatory* hostile work environment, Plaintiff must show the hostile behavior was *retaliation*.  See Chapter 7 Tr., 683 F.3d at 1259 (noting that the materially adverse action must be "causally connected" to the protected activity).  The only way Plaintiff tries to show causation is by alleging she "was subjected to a hostile work environment" after she made a complaint about Mr. Youngs.  [Doc. 33 at 11].  As will be discussed below, the mere fact that one event happened some unspecified amount of time after another event does not establish causation.

length of time between Plaintiff's complaint and the PIP/termination negates any inference of causation, and Plaintiff does not point to any other evidence that her PIP/termination had anything to do with her May 2018 complaint.  See Brown v. Alabama Dep't of Transp., 597 F.3d 1160, 1182 (11th Cir. 2010) (holding that "a three-month interval between the protected expression and the employment action . . . is too long"); see also [Doc. 33 at 11].

Instead, Plaintiff relies on the assertion from her Complaint that she "continued to make supplemental complaints of racial discrimination" including to Mr. Engels, but as discussed above the evidence does not support that assertion.  See [Doc. 33 at 11].[10] Even if Plaintiff made "supplemental complaints of discrimination," she still fails to show a causal connection with her PIP/termination.  Plaintiff merely says that after she made "additional complaints, [she] was placed on a PIP." [Doc. 33 at 11].  As noted above, "mere temporal proximity, without more, must be 'very close.'"  Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1364 (11th Cir. 2007) (quoting Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273, (2001)).  At best, Plaintiff asserts she made

---

[10] In her Statement of Additional Material Facts, Plaintiff also asserts "she was placed on the PIP due to racial discrimination and retaliation because of the complaint she made about Mr. Youngs." [Doc. 36-1 ¶13].  But the evidence she cites does not mention racial discrimination, retaliation, or any complaint about Mr. Youngs. [Doc. 29-4 at 245:2–250:5].

additional complaints sometime after July 2019.  See [Doc. 33-1 ¶5]; [Doc. 36-1 ¶8].[11]

That vague assertion, however, does not establish a causal connection with her PIP

(five months later) or her termination (seven months later).  See Brown, 597 F.3d at

1182.  For the foregoing reasons, the undersigned concludes that Plaintiff has not

shown a prima facie case of retaliation.

## B.    Legitimate, Non-Discriminatory Reason

Even if Plaintiff could show a prima facie case of retaliation, Defendant has

offered "legitimate, non-retaliatory reasons for placing [Plaintiff] on a PIP and

terminating her."  See [Doc. 29-1 at 19–21].  The PIP contains a host of non-retaliatory

reasons for the corrective action that are discussed below.  [Doc. 29-5 at 2].  And as

discussed above, Plaintiff concedes Defendant articulated a legitimate reason for the

termination: because "Plaintiff did not conform with the stipulations of her PIP."  [Doc.

33 at 14].  Thus, the burden shifts back to Plaintiff to show the proffered reasons for

her PIP/termination were pretext for retaliation.  See Gupta, 212 F.3d 592 (holding that

the plaintiff failed to show the defendant's "proffered nondiscriminatory reasons for its

employment decisions were pretextual and that the real reasons behind their actions

---

[11] To be sure, Plaintiff's ethics hotline complaint was in close temporal proximity
to her termination.  But that complaint was not "protected activity" within the meaning
of Title VII or § 1981 because it was not about race discrimination or retaliation.  See
Sridej v. Brown, 361 F. App'x 31, 35 (11th Cir. 2010).

were retaliatory").

### C.   <u>Pretext</u>

In response to the Motion for Summary Judgment, Plaintiff never argues the reasons for her PIP were pretextual.  <u>See</u> [Doc. 33].  In her Statement of Additional Material Facts, Plaintiff claimed the "events that were cited within the PIP were misstatements and lies" but the evidence she cites fails to show pretext.  <u>See</u> [Doc. 36-1 ¶11].  The PIP says another manager "felt bullied by [Plaintiff]."  [Doc. 29-5 at 2]. Plaintiff asserts she "was not bullying" the manager because that manager "was the slut of the team" and "her behavior was deplorable."  [Doc. 29-4 at 205:6–206:3].  The next day, Plaintiff allegedly "made disparaging comments about a nationality."  [Doc. 29-5 at 2].  Plaintiff asserts her conduct was not disparaging because she simply made a "joke" about "Latin people" pretending "to forget to know English."  [Doc. 29-4 at 214:15–217:5].  Plaintiff also asserted it was "not true" that she made a client uncomfortable with her conduct, but admitted she had no evidence to support her position.  [<u>Id</u>. at 221:17–223:7].  Plaintiff further conceded that she left in the middle of a mandatory meeting but asserted she did so because of "an emergency."  [<u>Id</u>. 223:8–225:12].  In short, Plaintiff has not shown Defendant's reasons for the PIP were pretext for retaliation.  <u>See</u> <u>Jackson,</u> 405 F.3d at 1289.

Likewise, as discussed above, Plaintiff has not shown the reasons for her

termination were pretextual.  Regardless of whether Plaintiff "initiated" contact with Mr. May and regardless of whether Plaintiff made "derogatory remarks," the undisputed fact is that Mr. May "expressed his dissatisfaction with being involved involuntarily in an internal Wood matter."  [Doc. 33-1 ¶12].  This violated the PIP's requirement that Plaintiff adjust her "conduct/behavior to eliminate calls from the client."  [Doc. 29-5 at 3].  And Plaintiff freely admits she violated two other requirements of her PIP.  See [Doc. 33-1 ¶17].  Just like Plaintiff, another employee outside Plaintiff's protected class was terminated for failing to fulfill the requirements of his PIP.  [Id. ¶22].  Thus, Plaintiff has not shown Mr. Engels' reasons for terminating her were false.  Even if Plaintiff had shown any of Defendant's reasons were false, she has not shown that retaliation "was the real reason" for the PIP or her termination.  See St. Mary's, 509 U.S. at 515. For all the foregoing reasons, the undersigned **RECOMMENDS** that Defendant's Motion for Summary Judgment be **GRANTED** as to Plaintiff's retaliation claims.

## **CONCLUSION**

As explained above, the undersigned **RECOMMENDS** that Defendant's Motion for Summary Judgment ([Doc. 29]) be **GRANTED**.  Since this is a final Report and Recommendation and there are no other matters pending before this Court, the Clerk is directed to terminate the reference to the undersigned.

**SO REPORTED AND RECOMMENDED**, this   2   day of December, 2021.

LINDA T. WALKER
UNITED STATES MAGISTRATE JUDGE